CORSTVET, Appellant, vs. BANK OF DEERFIELD, Respondent.

*October 9, 1935—February 4, 1936.*

210

212

For the appellant there were briefs by *Olin & Butler* and *R. M. Rieser,* and oral argument by *Mr. Rieser* and *Mr. Eldon Cassoday,* all of Madison.

For the respondent there was a brief by *Gilbert, Ela, Heilman & Raeder,* and oral argument by *Mr. Oscar Christianson* and *Mr. G. Burgess Ela,* all of Madison.

For the State of Wisconsin and the Banking Commission there were briefs by the *Attorney General* and *Harold M. Wilkie* of Madison, special counsel, as *amici curiæ.*

The following opinion was filed December 3, 1935:

ROSENBERRY, C. J.   The plaintiff contends, first: That sec. 220.07 (16), Stats., does not apply to depositors who were such prior to the date of its passage, January 23, 1932; that if sec. 220.07 (16) is construed to apply to deposits made prior to the date of the act, it is unconstitutional and void because it impairs the obligation of the contract existing between the plaintiff and the bank.   Second: The plaintiff likewise contends that so construed the statute is unconstitutional because in contravention of sec. 1 of the Fourteenth amendment of the constitution of the United States and sec. 13 of art. I of the constitution of this state, because it deprives the plaintiff of his property without just compensation and without due process of law.   Third: Plaintiff contends that even if the statute be valid, the stabilization agreement entered into by the parties was not in conformity with the statutes, and therefore not operative.

A determination of the first question raised requires a careful consideration of the history of the applicable provisions of ch. 220, Stats.   Under the law as it existed in October, 1931, the date of the first stabilization arrangement, five courses might be pursued with respect to a bank

whose capital was impaired: (1) The commissioner of banking might require the bank by order to make good such impairment. (Sec. 220.07, Stats. 1931.) (2) The board of directors of the bank had the power to make a *pro rata* assessment. (Sec. 220.07, Stats. 1931.) (3) The board of directors might place the bank in the hands of the commissioner for liquidation. (4) The commissioner of banking might upon the conditions prescribed in the statute if he was of the view that it was unsafe or inexpedient for the bank to continue business—

"forthwith take possession of the property and business of such bank or banking corporation, and retain such possession until such bank or banking corporation shall resume business, or its affairs be finally liquidated as herein provided." (Sec. 220.08, Stats. 1931.)

(5) The provisions of sub. (15), sec. 220.08, enacted in 1927, might be invoked. This subsection is as follows:

220.08 (15), Stats. 1931: "Whenever the commissioner of banking, with a view of restoring the solvency of any bank of which he has taken charge pursuant to law, shall approve a reorganization plan entered into between the depositors and unsecured creditors of such bank and the bank or reorganizers thereof, which represent ninety per cent of the amount of deposits and unsecured claims of such banks, then and in such case all other depositors and unsecured creditors shall be held to be subject to such agreement to the same extent and with the same effect as if they had joined in the execution thereof, and their claims shall be treated in all respects as if they had joined in the execution of such articles or reorganization plan in the event of restoration of such bank to solvency, and the reopening of the same for business. All deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof."

The banking situation in the state of Wisconsin was such as seriously to threaten the public welfare, and in December, 1931, the legislature was convened in special session to deal

with it. Among other things, there was created by ch. 15, Laws of Special Session 1931–32, sec. 220.07 (16), Stats., the material part of which is as follows:

"Whenever the commissioner of banking, with a view to stabilizing and readjusting the banking structure of any bank, shall approve a stabilization and readjustment agreement entered into between such bank and the depositors and unsecured creditors of such bank which shall represent eighty per cent of the amount of deposits and unsecured credits of such bank, then in such case, all other depositors and unsecured creditors shall be held to be subject to such stabilization and readjustment agreement to the same extent and same effect as if they had joined in execution thereof, and their claims shall be treated in all respects as if they had joined in the execution of such stabilization and readjustment agreement. . . . [Omitted part relates to power of municipalities to consent to stabilization.] All deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof."

The same act amended the last clause of sec. 220.08 (15), Stats. 1931, by changing the word "thereof" to "hereof."

By ch. 10, Laws of Special Session 1931–32, there was created a banking review board. Its duties were to advise with the commissioner of banking and others with respect to improvement in the condition and service of banks and banking business, and to review the acts and decisions of the banking commissioner, and to perform such other review functions in relation to banking as may be provided by law.

By sec. 2, sub. (3), ch. 10, Laws of Special Session 1931–32, it was provided that any determination of the banking review board might be subject to review in an action in the circuit court for Dane county.

Ch. 15, Laws of Special Session 1931–32, originated as Senate Bill No. 14, S., and was entitled:

"A Bill to amend subsection (15) of section 220.08 of the statutes, relating to the reorganization of any bank which has been taken over by the commissioner of banking."

When it reached the assembly, Substitute Amendment No. 1, A., to Bill No. 14, S., was offered. That was an act entitled:

"To repeal subsection (7) of section 59.74 and to amend the introductory paragraph of section 20.53, subsection (1) of section 59.75, paragraph (b) of subsection (9) of section 157.11, subsection (2) of section 220.02 and subsections (4) and (15) of section 220.08 of the statutes, relating to the banking laws, and making an appropriation."

Subsequently, Substitute Amendment No. 2, A., to Bill No. 14, S., was offered, and the following was added to the title:

"And to create section 220.065, subsection (4) of section 14.50 and subsection (16) of section 220.07 of the statutes, relating to the banking laws, and making an appropriation."

Sec. 220.08 (15), which was enacted by the legislature of 1927, closed with the following provision:

"All deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof."

In the second substitute amendment, sec. 220.07 (16) closes with this identical language. It is argued that the use of this language in sub. (16) amounts to a legislative declaration that the section was not to apply to any deposits except those made thereafter. It must be conceded that there is considerable force to this argument.

Some of the difficulty of construing the provisions of ch. 220, Stats., flows from our system of statutory revision. (Secs. 43.08, 35.08.) When a subsection of the statutes is created by an act of the legislature, it is worded ordinarily so as to fit into the language of the chapter or section of the statute which it amends or modifies.

The position given to a section may be very persuasive as to legislative intent. *Montreal Mining Co. v. State,* 155 Wis. 245, 144 N. W. 195; *Hanauer v. Republic Building Co.* 216 Wis. 49, 255 N. W. 136, 256 N. W. 784.

Sec. 220.07 (16), Stats., which is under consideration, was created by ch. 15, Laws of Special Session 1931–32, and was part of sec. 3 of that act. When put in its appropriate place in the statutes, it became a part of sec. 220.07. The word "section" in the last sentence of the newly-created subsection may refer to sec. 3 of ch. 15, Laws of Special Session 1931–32, or it may refer, when read in connection with sec. 220.07, Stats., to that section. If the language had been: "All deposits made in any state bank subsequent to the passage of this act," etc., it would have expressed clearly the legislative intent to make the act applicable to subsequent deposits. If it be held that the word "section" refers to sec. 3 of ch. 15, Laws of Special Session 1931–32, there is nothing in that section except sec. 220.07 (16) that is in any way applicable to deposits or the rights of depositors. It is clear that so construed the provision is meaningless because the newly-created subsection would apply to all deposits whether so expressly stated or not.

There is some internal evidence that sub. (16) of sec. 220.07 was originally intended to be a part of sec. 220.08. As has already been pointed out, the title to the original bill indicated that it was an amendment to sec. 220.08. It is numbered as if it was a continuation of sec. 220.08. The change of the word "thereof" to "hereof" is also quite persuasive upon this point. There being no other provision of sec. 220.07 applicable to deposits, it would follow that the word "hereof" should have been used instead of "thereof," because the provisions of sec. 220.07 (16) were the only ones applicable. Considered as sub. (16) of sec. 220.08 the word "thereof" has a definite meaning, and there appears a sufficient reason for the amendment of sec. 220.08 (15) by which the word "thereof" was changed to "hereof,"—that is, it was intended to make all of the provisions of sec. 220.08 applicable to future deposits, in which event the solution of our difficulty would have been to hold in accordance with well-

established principles that the re-enactment of the language was merely a continuation of the statutory provisions. *Kugler v. Milwaukee,* 208 Wis. 251, 242 N. W. 481; *State ex rel. Globe Steel Tubes Co. v. Lyons,* 183 Wis. 107, 197 N. W. 578.

In reality, sec. 220.07 (16) merely amends sec. 220.08 (15). The entire legislative purpose would have been accomplished if sec. 220.08 (15) had been amended to read as follows:

"Whenever the commissioner of banking with a view to restore the solvency of any bank before or after he has taken charge of it pursuant to law, shall approve a reorganization plan," etc.

The construction contended for by the plaintiff requires us to construe the law as if it read: "All deposits made in any state bank subsequent to the passage of this subsection shall be subject thereto"—this on the theory that the word "section" in the sentence refers to section 3 of the act. There are other and persuasive considerations which lead us to the conclusion that the contention of the plaintiff cannot be sustained.

Sub. (16) of sec. 220.07 is under the statutory scheme difficult of classification. It relates to a voluntary stabilization in which aspect it should be classified as a part of sec. 220.07, which deals with that subject matter. It also deals with the matter of stabilization, in which event it should be classified as a part of sec. 220.08, in as much as sec. 220.08 (15) was up to that time the only provision in the statutes which dealt with stabilization. Whether it is to be classified in one way or the other, there can be no doubt that as enacted by ch. 15, Laws of Special Session 1931–32, secs. 220.08 (15) and 220.07 (16) are in *pari materia.* The enactment of sub. (16) did but one thing—it authorized the commissioner to approve a stabilization and readjustment agreement voluntarily entered into between the bank and its depositors and unsecured creditors. Until the enactment of that sec-

tion, in order to bring into operation the provisions relating to stabilization contained in 220.08 (15), the commissioner had to be in charge of the bank. In view of the situation with which the legislature was attempting to deal, and bearing in mind that the only power conferred upon the commissioner was the power to approve a voluntary agreement without taking over the bank, it would be unreasonable and defeat the entire legislative purpose to hold that sec. 220.07 (16) could only apply to deposits thereafter made. When the provisions of ch. 220, Stats., are considered as a whole in the light of the situation which existed, and the evident purpose of the legislature to make the provisions relating to stabilization less onerous than they were under the existing law, we are impelled to the conclusion that while an arguable inference arises that the provisions were not to apply to prior deposits, nevertheless the legislature did not intend to so provide. In briefs of counsel for the commissioner of banking, the argument was made that by reason of the numbering it should be held that sec. 220.07 (16) was clearly intended to be an amendment to sec. 220.08, in as much as there was no sub. (15) in sec. 220.07 and there was a sub. (15) in sec. 220.08. This argument derives some support from the fact that the original bill was introduced as an amendment to sec. 220.08, but the second substitute amendment offered in the assembly fails to support that contention. However numbered, the statutes are clearly in *pari materia* and should be so construed, and when so considered and construed it must be held that sec. 220.07 (16) applies to deposits made before as well as after the enactment of the section, in spite of the fact that so construed the sentence quoted is given no legal effect, as all deposits would be subject to the law even if it had not been so declared.

The conclusion which we have reached upon this branch of the case is strengthened by a consideration of the amendment to sec. 220.08 (15). As that section stood from its enactment in 1927 down to the time of the special session in

1931–32, ninety per cent of the amount of deposits and unsecured claims were required to join in a stabilization and readjustment agreement before it was subject to approval by the commissioner of banking. By ch. 15, Laws of Special Session 1931–32, the requirement was reduced to eighty per cent of the amount of deposits and unsecured claims. This evidences a clear intent to relax the provisions of the statute for the purpose of making a successful stabilization easier and more expeditious. If the argument of plaintiff, supporting his contention that sec. 220.07 (16) should be construed as applying to subsequent deposits, it is equally persuasive that the amendment of sec. 220.08 (15) should apply only to subsequent deposits. In that event we would have the anomalous situation of a stabilization agreement being required to be signed by eighty per cent of the deposits subsequent to the enactment of the amendment and ninety per cent of those made prior to its enactment.

In this case there can be no doubt that it was the purpose of the legislature by the enactment of the amendment of sec. 220.08 (15) and by the creation of sec. 220.07 (16) to facilitate the stabilization of banks in view of the extraordinary conditions which prevailed throughout the state; that in spite of the use of the language of the closing sentences of secs. 220.07 (16) and 220.08 (15), it was not the intention of the legislature to make these sections applicable only to future deposits. Such a construction would not only defeat the legislative purpose, but render those provisions of the statutes almost useless.

The plaintiff had no vested right in any method of procedure. Stabilization was a substitute for liquidation. In the opinion of the legislature in a proper case, stabilization procedure might be more advantageous to depositors, stockholders, and the public than a forced liquidation. The commissioner of banking was given power to determine in a particular case which procedure should be pursued. The de-

termination was not final and conclusive but might be re-
viewed. Having no vested right in any procedure, the plain-
tiff is deprived of no constitutional right by the application
of sec. 220.07 (16) as amended. *Doty v. Love,* 295 U. S.
64, 55 Sup. Ct. 558.

Second. Plaintiff very vigorously urges upon the court
the proposition that sec. 220.07 (16), already set out at
length, is as construed by the trial court and this court un-
constitutional because, (a) plaintiff's contract is thereby
impaired; (b) because there is no constitutional standard ex-
pressing the policy of the legislature and limiting the powers
of the commissioner of banking and the banking commis-
sion; (c) because as construed the section violates sec. 1 of
the Fourteenth amendment of the constitution of the United
States and sec. 13 of art. I of the constitution of the state,
because plaintiff is thereby deprived of his property without
just compensation and without due process of law.

In determining the question of whether or not the legisla-
ture acted in excess of and beyond its constitutional power
in enacting this section, it is necessary for us to determine
exactly what it is sub. (16), sec. 220.07, attempted to do.
This matter has been discussed to some extent in connection
with plaintiff's contention that sub. (16) does not apply, but
in the interest of an orderly treatment of the matter it will
be briefly restated here. The plaintiff asserts his rights upon
certificates issued October 17, 1931. At that time there
had been in force in Wisconsin for more than four years
sec. 220.08 (15). By that section as it existed when the
plaintiff's certificates were issued, the commissioner of bank-
ing, whenever he had taken over a bank, might approve a
reorganization plan entered into between the depositors and
unsecured creditors of that bank and the bank or the reor-
ganizers thereof, which represented ninety per cent of the
amount of deposits and unsecured claims of such bank. The
statute further provided that if such a plan was approved

nonassenting depositors and creditors should be bound thereby. By amendment enacted by ch. 15, Laws of Special Session 1931–32, the amount of necessary consenting deposits was reduced from ninety to eighty per cent. It is clear, therefore, that the deposits made by the plaintiff and his assignors in 1931 were subject to the provisions of sub. (15). We are at a loss to understand how a statute which merely permits the commissioner of banking to do without taking the harmful and destructive step of taking possession of a bank, what he could do if he took that step, in any way harms the plaintiff or impairs his contract. Sub. (16) as enacted in the January following the issuance of the certificates sued upon in November, 1931, is in no way more onerous than sub. (15) under which the certificates were issued. It merely permits the commissioner of banking to approve a stabilization agreement without taking possession of the bank. Under the laws that existed before the enactment of sub. (16), the commissioner of banking could take possession of the bank and determine whether he would liquidate it or approve a stabilization agreement. The effect of the approval of a stabilization agreement under sub. (16) is identical with a like approval under sub. (15). Therefore, the plaintiff's contract was in no way impaired. See *Wausau M. P. Co. v. Citizens State Bank,* 214 Wis. 654, 254 N. W. 379.

The argument made under this head that the law lays down no standard of conduct to guide the commissioner of banking in the administration of the act applies as well to sub. (15) as to sub. (16). Both procedures are designed to restore or continue the solvency of a bank. Just how the legislature could prescribe in advance a standard to govern a commissioner of banking in determining whether or not a plan of stabilization and reorganization should be approved that is more specific than the statute as enacted is difficult to see. The facts and circumstances which the commissioner of banking must consider in making a determination of that

kind are multitudinous, and probably differ in many respects in every case presented to him for consideration. The plans proposed by secs. 220.08 (15) and 220.07 (16) look to the promotion of the public interest by providing the people of the state with good banking institutions to facilitate business transactions, the theory being that it is equally for the benefit of the depositors and stockholders that the going value of the bank should be conserved.

It is said in appellant's brief: "The legislation does not state the terms or conditions under which it becomes operative or shall remain operative. All that is left to the debtor bank, which may name its own conditions without a hearing upon the facts warranting or justifying imposing such conditions, and without review of either a judicial or administrative nature, and above all no hearing afforded for dissenting creditors."

This statement is not justified in view of the provisions already referred to. The judgment of the banking review board was never sought in this case. The statute prescribed an orderly method for reviewing the determination of the. commissioner of banking. Certainly the standard prescribed here, which is that the commissioner may seek to restore the solvency of a bank in the interest of the public welfare, is as definite and certain as the statute authorizing the public service commission to find a reasonable rate. This matter will be dealt with more fully in a subsequent portion of this opinion.

The claim that by the terms of the provisions of sub. (16) plaintiff is deprived of his property without just compensation and without due process of law rests upon the proposition that plaintiff is deprived of the benefit of his contract through application of the section because no provision for review is made, nor does the law prescribe any procedure for the application of the section by the commissioner. As already pointed out, the statute in force at the time the second

stabilization agreement was executed afforded the plaintiff a complete and ready means of review, first, by the banking review board, then by the circuit court for Dane county, and then upon appeal to this court. Whatever the court, in the exercise of its jurisdiction, may be able to do, there can be no doubt that the banking review board had the power to review any act of the banking commissioner and to make upon such review a final order or determination. This was a review, not by a common-law court, but by an administrative tribunal to which none of the constitutional limitations restricting courts were applicable. By the provisions of sec. 220.035 any party in interest had the right to appear, participate in the examination of witnesses, and to present evidence. It is considered that the plaintiff was not deprived of his property without due process of law, nor was his property taken without just compensation.

Third. Plaintiff contends that he is not concluded by the statute because the defendant has not shown that the stabilization and readjustment agreement conforms to the requirements of the statute and it was therefore inoperative. In support of his position, it is claimed by the plaintiff that the required eighty per cent of deposits and unsecured claims did not sign the stabilization agreement; that those persons who had deposited money in the bank subsequent to the first stabilization agreement were given a preference.

The stabilization and readjustment agreement of 1932 remained a mere proposal to the commissioner of banking, and was without legal effect under the statute unless and until it was approved by him. *Wausau M. P. Co. v. Citizens State Bank, supra.* Whether or not the owners of the requisite amount of deposits and unsecured claims had signed the proposed stabilization and readjustment agreement was a matter of fact to be determined by the commissioner of banking before he made the approval. No attempt was ever made, so far as the record in this case discloses, to have this deter-

mination of the commissioner of banking reviewed by the banking review board created by ch. 10, Laws of Special Session 1931–32.

The commissioner of banking was an administrative officer charged with certain administrative duties, some of which were of a *quasi*-judicial character. Prior to the special session no administrative agency existed for the review of the acts and determination of the commissioner of banking. The creation of the banking review board was suggested, no doubt, by the fact that a very large number of banking institutions were in difficulty, making it apparent that many disputes would arise between the commissioner of banking and the various banking institutions under his jurisdiction and the stockholders and depositors of those banks. Under the situation as it existed, expedition was absolutely necessary in order to save the situation. The commissioner of banking might be required to act in some cases without having made all the investigation which he desired to make. Additional facts might be brought to light from time to time, situations might arise in which a review of the act of the commissioner of banking would be desirable.

The banking review board was created by ch. 10, Laws of Special Session 1931–32, which created sec. 220.035 of the statutes. Sub. (2) of sec. 220.035 provides:

"The duties of the board shall be to advise with the commissioner of banking and others in respect to improvement in the condition and service of banks and banking business in this state and to review the acts and decisions of the banking commissioner and to perform such other review functions in relation to banking as may be provided by law."

Sub. (3) provides:

"Any final order or determination of the banking review board shall, unless some other method of review is specially provided by law, be subject to review in an action in the circuit court for Dane county which action shall be governed as to time of commencement and in all other respects by the

provisions of law as to actions to review awards of the industrial commission except that in actions to review orders or determinations of the banking review board additional evidence may in the discretion of the court be received in the circuit court or the case sent back to the review board for the taking of further testimony if the court shall be of the opinion that additional evidence should be taken. On any such review the court shall affirm, reverse or modify the order or determination of the banking review board as the evidence and the law may require."

Provision is made for an appeal from the judgment of the circuit court to the supreme court.

On behalf of the plaintiff it is argued that no procedure is prescribed for bringing matters before the banking review board for revision. The act does provide:

"Any party in interest shall have the right to appear in any proceeding of the board and shall have the right to participate in the examination of witnesses and to present evidence."

Any interested person may also summon witnesses. The board was also empowered by sub. (4) to make—

"reasonable rules and regulations not inconsistent with law as to the time of meetings, time of hearings, notice of hearings and manner of conducting same and of deciding the matters presented."

While the statute does not in terms provide that any interested person might move the board by petition, that is a necessary inference. The provisions of the statute no doubt left the procedure as informal as possible in the interest of speedy action. There is no hint in this record that any petition, application, or request was ever made to the banking review board with reference to any matter connected with the stabilization agreement of 1932. While the statute does not require that notice of the entry of any order or decision by the commissioner of banking be served upon the interested parties, the statute apparently assumes that all parties in in-

terest would have the means of determining what disposition was made of the controversy. So, also, no time limit within which a review may be sought is prescribed by statute in which event, no doubt, it would be held that an aggrieved party must move within a reasonable time. What would constitute a reasonable time would depend upon all the facts and circumstances of the case, including knowledge or means of knowledge by the aggrieved party. Before the final order of approval had been entered by the commissioner of banking (banking commission), the statute was supplemented on February 11, 1933, by the enactment of sec. 220.02 (5). That section provides:

"Any interested person or any bank or banking corporation aggrieved by any act, order or determination of the banking commissioner may, within ten days from the date of such act, order or determination apply to the banking review board to review the action of the commissioner. All such applications for review shall be considered and disposed of as speedily as possible. The banking review board may require the commissioner of banking to submit any of his official actions to said board for its approval."

The plaintiff was not without guidance as to an orderly method of procedure at the time when his rights were affected by the order of the commissioner of banking.

It might be argued that plaintiff asserts no rights under the statute in question; that he seeks recovery upon an obligation to which he was entitled as a matter of right at common law and is not, therefore, bound by the terms of the statute. However, if the statute be valid and applicable, as we hold, the plaintiff finds himself, when he sues upon a certificate issued after the enactment of sec. 220.08 (15) in 1927, confronted by a statutory declaration that all depositors and unsecured creditors not signing—

"shall be held to be subject to such [stabilization and readjustment] agreement to the same extent and with the same

effect as if they had joined in the execution thereof, and their claims shall be treated in all respects as if they had joined in the execution of such [stabilization and readjustment agreement.]"

Plaintiff is, therefore, by force of the statute, in a position where he may not assert his right to recover on the certificates issued in October, 1931, because he is by the terms of the statute, if it be valid, bound in the same way and to the same extent as are the creditors who signed. Before he can recover upon the certificates issued to him, he must in some way set aside or dispose of the stabilization and readjustment agreement. In this case he attempts to do that by showing that the agreement is void. In the alternative he claims that if the agreement be not void because the statute is unconstitutional, that it is invalid because not in conformity with the statute. The question then arises, May the plaintiff attack the stabilization and readjustment agreement in a court without first having brought the matter before the banking review board for review? It is a well-established principle of law that where a special tribunal is created by statute, charged with the duty and having the power to review the determination of an administrative agency, that tribunal must be first resorted to before resort is had to the courts. *State ex rel. Superior v. Duluth St. R. Co.* 153 Wis. 650, 142 N. W. 184; *Schaefer v. Bickel,* 217 Wis. 278, 258 N. W. 797 (Banking case); *State ex rel. Allen v. Railroad Comm.* 202 Wis. 223, 231 N. W. 184; *State ex rel. Wisniewski v. Rossier,* 205 Wis. 634, 238 N. W. 825; *State ex rel. Waldorf v. Hill,* 217 Wis. 59, 258 N. W. 361; *Hegeman Farms Corp. v. Baldwin,* 293 U. S. 163, 55 Sup. Ct. 7, 79 L. Ed. 29.

It is considered that this well-established rule of law applies in this case. It follows that the plaintiff may not collaterally attack the determination of the commissioner of banking in an action brought to recover a money judgment

upon his certificates of deposit without first having brought the matter before the banking review board. Before that tribunal the plaintiff could have urged all the matters urged here under the contention that the stabilization and readjustment agreement is not in conformity with the statute, and might have persuaded the board to revise the act of the commissioner of banking. Courts have no power to revise these contracts. That is a power which resides in the administrative agency. All that the court can do is to determine whether or not the law under which the administrator proceeds is valid, and whether or not the commissioner of banking has acted in accordance with the provisions of a valid law. The necessity of a tribunal before which the acts of the commissioner of banking might be reviewed has already been referred to. The commissioner and the trial court found that more than eighty per cent of the deposits and unsecured claims were represented by the signatures upon the agreement. The plaintiff now seeks to set aside that agreement upon grounds which were never brought before nor considered by any administrative tribunal so far as the record discloses. This he may not do.

The provisions of the 1933 statute already referred to indicates an orderly procedure. That statute dealt with nothing but a remedy. It in no way affected the plaintiff's substantive rights. The statute as enacted in effect incorporated sec. 102.23 of the statutes relating to the judicial review of findings of fact made by the industrial commission. An orderly procedure was prescribed for review of any determination made by the banking review board.

In this action it must be held that plaintiff, having failed to avail himself of the remedy prescribed by statute, cannot assert the invalidity of the stabilization and readjustment agreement on the ground that it does not conform to the statute. In that regard the determination of the commissioner of banking must now be held to be conclusive. While

it is stated in the findings of fact that the act of the commissioner of banking was approved by the banking review board, we find no evidence to sustain that conclusion and treat the matter as if it rested solely upon the determination of the commissioner of banking. In this connection reference should also be made to plaintiff's claim that because the stabilization agreement by paragraph 5 authorized the trustees to use funds in their hands to take over from the bank at book (depreciated) value assets owned by the bank, it permitted the trustees to manipulate the funds derived from enforcing the double liability of stockholders for the benefit of the stockholders of the reorganized bank, and so deprived the plaintiff of his property without due process of law. That the powers of the trustees as set forth in the stabilization and readjustment agreement printed in the margin might be so used seems quite possible. However, the power conferred might be so used as to operate for the benefit of the plaintiff as holder of participation certificates representing sixty per cent of his deposits because under the agreement the trustees take over the assets at a depreciated value, and if the assets increase in value it would be for the benefit of the fund. In addition to that, while plaintiff has a right to the extent of sixty per cent of his deposits to an interest in the assets controlled by the trustees, he also has the right under his certificates of deposit amounting to forty per cent of his deposits against the assets of the reorganized bank, which, if his contention is true, would be strengthened by the operation. It is quite probable, therefore, that he might gain more on the one side than he would lose on the other. However, this was also a matter within the jurisdiction of the commissioner of banking, and his acts were subject to review by the banking review board. The facts are by no means all before this court, nor were they all before the trial court. The bank has been audited, examined, and re-examined, its assets appraised and reappraised, and the commissioner of

banking had full and complete knowledge of everything relating to the bank's affairs. The commissioner of banking evidently believed the provisions of the trust agreement to be fair and equitable and for the benefit of all parties concerned. If the plaintiff wished to contend otherwise, he should have sought a review in the manner prescribed by statute.

The same rule applies to the claim that those persons who had made deposits of so-called new money, that is, money received after October 17, 1931, and kept separate from other moneys of the institution and against which checks were issued and payments were made upon demand down to the closing of the bank in November, 1932, were by the terms of the agreement constituted a class of preferred creditors. There is considerable merit in this contention viewed purely as a legal proposition. The equities in favor of it, however, are not very persuasive. Certainly the plaintiff was helped rather than hindered by the continued operation of the bank. It could not operate without new deposits. That these new depositors should be protected seems from every standpoint reasonable, although there was nothing in the arrangement made in October, 1931, which required that, except that it is said that it was the general understanding that new deposits should be so treated, and that they were so treated at all times thereafter.

This provision of the contract which was approved by the commissioner of banking could have been reviewed by the banking review board if their jurisdiction in that regard had been properly invoked. The failure of the plaintiff to so invoke the powers of the board concludes him in this as well as in other respects already considered.

The plaintiff having made his deposit in 1931, it was subject to the provisions of the statute enacted in 1927, which provided that a stabilization and reorganization agreement might be approved by the commissioner of banking. The

commissioner of banking was not required either by the terms of the act or by the requirements of due process to give notice of his proposed approval of the stabilization and reorganization agreement. Such notice was no more necessary to subject plaintiff's deposit to the terms of the act than was notice that he proposed to take over the bank, and so bring into existence the so-called double liability of the stockholder. . The plaintiff having had a right of review before the banking review board, with the further right to carry the controversy to the courts for judicial consideration, he was deprived of no right without due process of law. The right of appeal or review of a determination made without notice of itself affords the complaining party due process. *American Surety Co. v. Baldwin,* 287 U. S. 156, 53 Sup. Ct. 98, 77 L. Ed. 231, 86 A. L. R. 298.

From what has been said it follows that the trial court did not err.

*By the Court.*—Judgment affirmed.

FAIRCHILD, J. (*dissenting*). I can agree with some of the conclusions reached in the decision, but cannot subscribe to the ultimate result. I find no fault with a portion of the following statement: "There can be no doubt that it was the purpose of the legislature by the enactment of the amendment of sec. 220.08 (15) and by the creation of sec. 220.07 (16) to facilitate the stabilization of banks in view of the extraordinary conditions which prevailed throughout the state;" but I do not agree with the balance of the statement which reads: "That in spite of the use of the language of the closing sentences of secs. 220.07 (16) and 220.08 (15), it was not the intention of the legislature to make these sections applicable only to future deposits. Such a construction would not only defeat the legislative purpose but render those provisions of the statute almost useless." My objection to the decision chiefly centers here. The law under consideration is not con-

sidered an emergency measure. It has none of the characteristics of such legislation. The wisdom of it may have been suggested by conditions arising from the depression, but the law itself is not limited to any period of depression, nor was it passed to meet conditions peculiar to any crisis. It was not to affect immediate conditions, but was to be in force from and after its passage, and it is subject to the same rules of construction as any ordinary statute is. Analyzed with the usual rules of construction in mind, the use of the language in the closing sentence of sec. 220.07 (16) is serviceable, effective, and it means exactly what it says. It provided that the act was not to affect conditions immediately present. This, it seems to me, plainly appears from the use by the legislature of the words: *"All deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof."* The intent of the legislation is first to be sought in the language of the statute itself, which is to be given such reasonable construction as will, if possible, make all parts harmonize with each other and render them consistent with its scope and object. If the intent is plainly expressed, it is to be followed without further inquiry. In 2 Lewis' Sutherland, Statutory Construction, § 367, it is said:

"When the intention of the legislature is so apparent from the face of a statute that there can be no question as to the meaning, there is no room for construction. It is not allowable to interpret what has no need of interpretation. . . . There is no safer or better settled canon of interpretation than that when language is clear and unambiguous it must be held to mean what it plainly expresses."

If the meaning of a statute is clear, whether it is wise or unwise, or if a better method may be suggested of reaching a particular situation, it can only be changed by the legislature. An amendment is not to be effected by judicial construction.

The advisability of permitting stabilization prior to insolvency proceedings occurred to the legislature, and they accordingly made provision therefor. The legislature followed a method that had been used by the 1927 legislature with relation to insolvent banks. There was no doubt about the meaning of the closing words of the statute relating to stabilization of banks in receivership passed in 1927, and now known as sec. 220.08 (15), Stats. Those words were taken from a similar provision enacted by the legislature of the state of Minnesota. The meaning of those words was considered by the supreme court of that state in *Thorman v. State Bank of Waverly,* 166 Minn. 433, 208 N. W. 185. It is there said:

"In view of this provision, we think it is plain that the act has no application in the case at bar. Plaintiff's deposit was made more than a year before chapter 38 was enacted, and his rights and those of others similarly situated are not affected by its enactment. A holding to the contrary would not only disregard the plain language of section 2, but would also disregard the well-settled rule that a statute is not to be given a retroactive operation unless it appears by express command or by necessary and unavoidable implication that such was the legislative intention, and the further rule that, where a statute deprives an individual of a legal right he enjoyed when it was enacted, it should be construed to be prospective in its operation, unless a contrary construction is essential to give it effect, or its terms are so explicit as to preclude any other interpretation. *Builders' Limited Mut. Liability Ins. Co. v. Compensation Ins. Board,* 151 Minn. 427, 186 N. W. 860."

Banks are important institutions and considerable factors in the scheme of our economy, but the rights of the creditors of these institutions are also matters of great concern. Although the creditor's debt may degenerate and become the subject of compromise in case of an insolvent bank, it cannot be ignored, much less so when dealing with a going insti-

tution. No justification for the wiping out of a right belonging to a depositor, provided for in his contract, and protected by the legislature in its enactment of sub. (16) of sec. 220.07, Stats., can be found in any theory based on the two laws being in *pari materia*. This is not sufficient to place sec. 220.07 (16) in such a light that it must mean the same thing as sec. 220.08 (15), and I disagree with the majority opinion in its holding that the legislature did not intend to have a distinction between the affairs of banks before the commissioner has taken charge of the institution, and of banks after such an act has taken place. Each of the two statutes relate to the subject of stabilization of banks, but the condition of insolvency or suspension provided for in sec. 220.08 (15), is not contained in sec. 220.07 (16), and certainly no valid authority can exist for holding that the legislature did not intend to give full meaning and effect to the words used in drafting sec. 220.07 (16), quoted above in italics. The law-making body excluded from the legislation moneys deposited prior to the enactment of that law.

The statutes treated in the majority opinion as being in *pari materia* are still two complete and independent acts. I am of the opinion that the meaning is so plainly expressed in each that there is no occasion for the court to resort to the doctrine of statutes in *pari materia* for the purpose of construction. It was said in *State ex rel. Haswell v. Cram,* 16 Wis. *343, *347:

"Now does the doctrine that statutes in *pari materia* are to be taken together and construed as one act, affect the question. It is a rule of construction, resorted to in cases of doubt, and is never applicable where the statute is plain and unambiguous. Sedgwick on Statutory Law, 231, 247. The acts in question are of the latter character. No doubt arises upon the face of either, and it would seem to be a perversion of the rule to apply it for the purpose of defeating the will of the legislature so plainly expressed."

The majority fail to give full importance to the differences in the law between regulations affecting the rights of a creditor of a going institution, and those of a claimant against an institution in the hands of a receiver. Sec. 220.07, Stats., treats with going concerns; sec. 220.08, Stats., treats with an insolvent institution, or what is its equivalent, a bank in the hands of the banking commission.

Since 1927, when a bank was in the hands of a receiver, a reorganization agreement entered into between the depositors and unsecured creditors and the bank or reorganizers could be approved by the commissioner of banking under certain conditions and restrictions, and made binding on all depositors if ninety per cent joined in the plan. That was the only system controlling in this respect until it was suggested that reorganization and stabilization be permitted before the commissioner had taken charge, and while the bank was still a going concern. In 1931–32, the legislature saw fit to provide a means whereby it would be possible to stabilize a bank without closing it, and permit it to continue to receive new deposits. This was accomplished by the passage of sec. 220.07 (16), Stats. That section provides a scheme under which the commission, in certain instances, and if satisfied that the interests of the creditors and the community at large will be better served by a stabilization and reorganization agreement than by closing the bank, may enter an order, serving it upon the bank, which provides that pending the submission and acceptances of such reorganization agreement, the then existing assets of such bank shall be segregated for the benefit of its then depositors and creditors. The costs of the stabilizing arrangement are to be charged against the bank. This legislation is a new extension into the field of banking regulation. It affected the terms on which deposits had been made, added a new burden to, and introduced a new condition in a contract. Because of this, the legislature, desiring to conform

to the requirements of the constitution, expressly provided in sec. 220.07 (16), Stats., that "all deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof." The money of this plaintiff was in the bank before the passage of that act and could not be affected by it. It would be logically and constitutionally excluded from the effects of that legislation, and the legislature, to make that plain, used the language in the statute quoted.

Now to require the creditor to submit to that legislation, and to appeal to the banking review board, would amount to the taking from him of a right to collect moneys over which the stabilization agreement has no influence whatever. The banking commission has the duty to supervise banks. Solvent and going concerns are included, but one who stands in the position of an ordinary creditor of a going bank is not to be treated as limited by the legislation providing for review by the banking review board. There is good reason for holding that the legislature did not intend to preclude such a creditor from an appeal to the courts when his ordinary rights have been violated. It seems clear to me that the contract rights were fixed and determined when the deposit was made, and that these rights were not only not interfered with, but were protected by the legislation of 1931–32. The effect of the decision in this case is to permit the taking of private property for the benefit of others, and is a clear violation of the contract rights of the plaintiff. The legislature purposely and pointedly put words of exclusion at the end of the law. Those words appear in sub. (16) of sec. 220.07, Stats.

As to sub. (15) of sec. 220.08, Stats., the amendment changed the closing word of that section by substituting the word "hereof" for "thereof." That was done to protect the then existing depositors against being required to submit to

the eighty per cent rule which was brought into existence by that amendment. Until the amendment of sub. (15) of sec. 220.08, the consent of ninety per cent of the depositors was necessary to a stabilization proposition. The amendment reduced this amount to eighty per cent. The legislature, in an effort to meet requirements of constitutional law, provided that only deposits made thereafter should be subject to the conditions "hereof," meaning the amendment. This display of care on the part of the drafters of the bill and of those who enacted the law, as well as the language used, carries the conviction to me at least that the legislature did not intend to interfere with the rights then existing. They did not intend to change lawful contracts. But they did intend that in the future contracts arising out of the relation of the depositor with the bank should be different from what they had been, and should contain the provisions of the new legislation. Because of these considerations, I cannot accept the result reached by the majority, and respectfully dissent.

FRITZ, J. (*dissenting in part*). For the reasons stated in the dissenting opinion filed by Mr. Justice FAIRCHILD, I do not concur in the court's conclusion that the unambiguous and explicit provision that "All deposits made in any state bank subsequent to the passage of this section shall be subject to the conditions thereof," in sec. 220.07 (16), Stats. 1933, "applies to deposits made before as well as after the enactment of the section, in spite of the fact that so construed the sentence quoted is given no legal effect as all deposits would be subject to the law even if it had not been so declared."

However, as is stated in the opinion filed for the court: "The stabilization and readjustment agreement of 1932 remained a mere proposal to the commissioner of banking, and

was without legal effect under the statute unless and until it was approved by him. . . . Whether or not the owners of the requisite amount of deposits and unsecured claims had signed the proposed stabilization and readjustment agreement was a matter of fact to be determined by the commissioner of banking before he made the approval. No attempt was ever made, so far as the record in this case discloses, to have this determination of the commissioner of banking reviewed by the banking review board created by ch. 10, Laws of Special Session 1931–32." In view of those matters, and for the reasons stated by the court in connection therewith, I concur in its conclusions that before the plaintiff "can recover upon the certificates issued to him he must in some way set aside or dispose of the stabilization and readjustment agreement;" that "the plaintiff may not collaterally attack the determination of the commissioner of banking in an action brought to recover a money judgment upon his certificates of deposit without first having brought the matter before the banking review board;" that "plaintiff having failed to avail himself of the remedy prescribed by statute cannot assert the invalidity of the stabilization and readjustment agreement on the ground that it does not conform to the statute;" that his failure to so invoke the powers of the board concludes him in that regard as well as in all other respects considered in the opinion; and that, because of those conclusions, the judgment must be affirmed.

A motion for a rehearing was denied, with $25 costs, on February 4, 1936.